**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-01913

MICHAEL CERCE, an individual,

Plaintiff

v.

ZILLOW, INC., a Washington corporation,

Defendants

---

**COMPLAINT AND JURY DEMAND**

---

COMES NOW the Plaintiff, Michael Cerce ("Mr. Cerce"), by and through his attorneys, Miller & Law, PC, and for his Complaint against the Defendant, Zillow, Inc. ("Zillow," the "Company," or "Defendant"), states as follows:

**NATURE OF THE ACTION**

This action is brought to redress Zillow's violation of: (i) Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e; and (ii) the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 - 12117. Specifically, the Plaintiff alleges that Zillow engaged in unlawful employment practices on the basis of Mr. Cerce's male gender as well as his disability, denied his reasonable requests for accommodations related to his disability, retaliated against Mr. Cerce for engaging in protected activities – including his participation in the employment-related investigation of the claims of "Ms. Doe" referenced herein, his requests for reasonable accommodations related to his resulting disability and for complaining of discriminatory employment practices - by creating and escalating a hostile work environment and singling him out for mistreatment, culminating in the constructive termination of Mr. Cerce's employment, all in violation of the ADA and the Civil Rights Act.

## JURISDICTION AND VENUE

1. This Court has original jurisdiction over this matter pursuant to 28 U.S.C. §§1331 and 1343; Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-5(j); and Title II of the ADA, 42 U.S.C. § 12133.

2. The unlawful employment practices and defamatory acts alleged herein were committed within the jurisdictional boundaries of the United States District Court for the District of Colorado and venue is proper in this Court pursuant to 28 U.S.C. §1391(b) and 42 U.S.C. §2000e-5(f)(3).

## ADMINISTRATIVE PREREQUISTIES

3. Prior to filing this Complaint, Plaintiff complied with all procedural prerequisites for bringing this lawsuit. He timely filed a charge of employment discrimination against Zillow with the Colorado Civil Rights Division ("CCRD") and the United States Equal Employment Opportunity Commission within 300 days of the subject discrimination and/or retaliation.

4. Plaintiff has been issued a Notice of Right to Sue with respect to his charge of employment discrimination against Zillow.

5. The filing date of this Complaint is within 90 days of the March 31, 2020 effective date of the Notice of Right to Sue that the CCRD issued to Plaintiff.

6. As this Complaint has been filed within the 90-day period following the issuance of his Notice of Right to Sue, Plaintiff has satisfied all procedural prerequisites for suing Zillow in federal court under 42 U.S.C. §2000e-5(f)(1).

## PARTIES

7. Mr. Cerce is an individual resident of Colorado with a residential address of 18295 Cottonwood Dr., Unit 3-204, Parker, CO 80138.

8. Zillow is a Washington corporation, with its headquarters located at 1301 Second

Ave., Fl. 31, Seattle, Washington 98101. Zillow employs more than 15 employees.

**GENERAL ALLEGATIONS**

9. Mr. Cerce began working at Zillow as a Sales Executive in November 2017.

10. Zillow's sales division connects real estate agents to Zillow's platforms in order to assist them in connecting with potential customers.

11. Zillow is a wholly-owned subsidiary of Zillow Group, Inc. ("ZGI").

12. According to Zillow, ZGI houses a portfolio of the largest and most vibrant real estate and home-related brands on the Internet and mobile.

13. According to Zillow, ZGI's brands focus on all stages of "the home lifecycle," including renting, buying, selling, financing, and home improvement.

14. According to Zillow, ZGI offers a comprehensive suite of marketing software and technology solutions to help real estate, rental, and mortgage professionals maximize business opportunities and connect with millions of consumers.

15. As a Sales Executive, Mr. Cerce was responsible for bringing in new accounts through cold calling in assigned sales territories and handling inquiries from potential sales prospects.

16. In September 2018 a female Zillow employee, "Ms. Doe," reported that her cell phone had been stolen while she was at work.

17. Ms. Doe claimed that the thief/stalker thereafter had been contacting her by text message and was threatening to release sexually-explicit videos that were saved on the cell phone unless she complied with their demands.

18. Disturbingly, the thief/stalker appeared to be tracking Ms. Doe's movements and activities and was sending messages that included increasingly vulgar and hostile language.

19. The thief/stalker routinely referenced information relating to Zillow and the respective whereabouts of both Ms. Doe and Mr. Cerce.

20. Ms. Doe reported that she believed the thief/stalker was likely another Zillow employee.

21. Indeed, from the very beginning of this terrifying matter, Mr. Cerce was particularly and rightfully concerned with the fact that the thief/stalker seemed to be a Zillow employee.

22. One of the first texts that Ms. Doe received from the thief/stalker on September 27, 2018 boasted that Zillow security was "a joke! My car got hit in the parking lot recently and they couldn't figure out who did it."

23. Ms. Doe notified Zillow of her concerns regarding the thief/stalker and filed a police report as well.

24. Zillow began investigating these serious allegations to determine whether an individual who had authorized access to Zillow facilities might be the perpetrator; further, due to the concerns expressed by Ms. Doe regarding her personal safety and the safety of her children, the Company also hired a private security firm, Pinkerton, to provide Ms. Doe with a protective detail as an interim safety precaution.

25. Shortly after becoming aware of Ms. Doe's concerns, Zillow's Human Resources Business Partner, Danielle Nau, directly involved Mr. Cerce in the situation.

26. In particular, following Ms. Doe's reported receipt of an additional threatening text message, instead of contacting the Denver Police or Pinkerton, Ms. Nau contacted Mr. Cerce at 8:00 pm on Saturday, October 6, 2018 and directed him to immediately drive to Ms. Doe's residence to offer protection; per Ms. Nau, Mr. Cerce needed to get over to [Ms. Doe's] residence "right away, this person is at her house and we need to make sure that she is safe!"

27. Zillow thus recklessly thrust Mr. Cerce into a potentially hostile and dangerous situation, without any regard for his safety.

28. In contrast, Zillow went above and beyond to protect Ms. Doe - including the provision of 24-hour surveillance on her home - while offering no protection whatsoever to Mr. Cerce, regarding whom the stalker had threatened to "ruin [his] career."

29. Unlike Ms. Doe, who was similarly situated to Mr. Cerce, Zillow did not go above and beyond to protect Mr. Cerce during the stalking incidents; Mr. Cerce was denied protection on the basis of his sex.

30. During a phone call between Ms. Nau and Ms. Doe, after Ms. Doe inquired as to why Zillow had not furnished Mr. Cerce with a security detail at his home as well, Ms. Nau casually replied, "he's fine. We are more concerned about your safety at this time."

31. In responding to the request that Mr. Cerce be provided with a security detail, Ms. Nau stated, *inter alia,* that "he's a guy. He can handle it."

32. Zillow's General Manager, Greg Davis, constantly checked in on Ms. Doe during this period to ensure that she was OK, yet he never once communicated with Mr. Cerce – until forcing him to return to work on November 27, 2018 (see *infra*).

33. During the investigations, which Zillow has acknowledged constituted a "protected activity," Mr. Cerce was openly critical of Zillow's lack of security, its surveillance camera system setup, its unsecured WiFi system, its inability to monitor or track WiFi usage at the office, and its inability to determine whether a Zillow employee was behind the stalking.

34. Among the Company representatives to whom Mr. Cerce made his complaints was Zillow's Denver Office Director, Ann Sobil.

35. With regard to the possibility that the stalker was a co-worker, Ms. Sobil coldly remarked to Mr. Cerce that this was “a risk we have to take.”

36. During the investigation and thereafter, Zillow – through Ms. Nau, its Director of Privacy and Compliance (Josh Parker) and others – revealed private and personal information of Mr. Cerce to numerous Zillow employees, information that Zillow had specifically promised Mr. Cerce would be held in strict confidence.

37. Mr. Cerce felt victimized by the manner in which Zillow had betrayed his trust in this regard, and complained about this betrayal of confidence to Zillow.

38. During the investigations, Ms. Nau specifically characterized the investigations as a “protected activity” in which Mr. Cerce and Ms. Doe were participating.

39. On information and belief, around the time of the investigations, Zillow published information and took other actions that caused other employees to believe that Mr. Cerce was the thief/stalker.

40. Zillow and Pinkerton concluded their investigations on or about October 15 and October 17, 2018, respectively.

41. Neither Zillow nor Pinkerton was able to substantiate Ms. Doe’s allegations.

42. While he was on leave relating to the investigations, Mr. Cerce was not paid for over two months of commissions.

43. By comparison, Ms. Doe received an email from Ms. Nau that instructed her to put in her PTO hours to “bridge the gap.”

44. Upon becoming aware of Ms. Nau’s email to Ms. Doe, Mr. Cerce then also put in a request to use his PTO hours, just as Ms. Doe had been directed to do; within minutes, however,

Mr. Cerce received a call from Ms. Nau stating that Zillow was denying his PTO request, and that Mr. Cerce would have to provide 30 days' advance notice in order to use his PTO.

45. When Mr. Cerce revealed to Ms. Nau that he had seen her email to Ms. Doe and demanded to know why he was being treated differently, Ms. Nau declined to answer and instead responded, "you're not supposed to be sharing information between employees."

46. In November 2018 Mr. Cerce informed Zillow that he had come to believe that Ms. Doe herself had perpetrated a hoax on Mr. Cerce and Zillow by falsely claiming that her cell phone had been stolen and that she was being threatened.

47. Mr. Cerce complained to Zillow of gender discrimination and retaliation in connection its handling of the cell phone thief/stalker situation.

48. For example, during a call on November 20, 2018 with Ms. Nau, Mr. Parker, a representative of Zillow's Legal Department, and its HR Director, Chis Gaines, Mr. Cerce made the following complaints:

> "Would you be frustrated if your whole life was turned upside down? You were treated indifferently? Everybody thought she was the victim, coddling her, making sure she was OK, making sure she was getting paid? And then there is me, who has just been totally disregarded throughout this entire process. I have a dollar and forty cents in my account right now, because I'm spending money I don't have to try to fix the situation, when I was telling you all along it was a Zillow employee, and you guys kept telling me it wasn't? And then you let her, the so-called victim, you guys emailed her and say "oh, use your PTO." And then 12 hours later, you approve it. I'm going to use my PTO, you tell me "…I should have put it in a month in advance," and then I was denied. Would you be frustrated, at this point, with all this stuff going on? I'm on so many medications. I've been going to the doctor, I have a mental health appointment tomorrow for, I have to go see a freaking mental health doctor over this. Would you be frustrated? . . . Everybody in the office knows everything, by the way. I get calls every day. I know all the managers know, everybody I work with knows the whole situation. My information is everywhere. And I didn't do anything wrong. I go to work every day. I help people. I do everything that I am supposed to do. I do not miss work. I am 150% Michael every single month. This is so f**king unfair, I can't even…"

49. Mr. Cerce thereafter sought a restraining order against Ms. Doe, and Zillow terminated her employment.

50. In the wake of his complaints and his participation in one or more protected activities, Mr. Cerce was repeatedly retaliated against by Zillow in multiple contexts.

51. On the very day that Ms. Doe was terminated, November 27, 2018, Zillow's General Manager, Greg Davis, called Mr. Cerce and demanded that Mr. Cerce return to work by Monday, December 3, 2018, or else Mr. Cerce would be considered as having resigned his employment; Mr. Davis threatened, "[b]e here Monday or you don't have a job."

52. During that conversation, Mr. Cerce remarked to Mr. Davis, "that's odd that this entire time, I haven't heard from you once, and the day your friend gets let go, you threaten me with my job."

53. Mr. Davis responded menacingly, "I'm not here to talk about [Ms. Doe]."

54. Although he was experiencing tremendous anxiety in connection with the stalker situation – which was diagnosed as a form of Post-Traumatic Stress Disorder ("PTSD") - being fearful of losing his job, Mr. Cerce reluctantly complied with Mr. Davis' demand and returned to work on that Monday, December 3, 2018.

55. The symptoms of Mr. Cerce's PTSD included extreme anxiety and nausea, significant weight loss (Mr. Cerce lost over 30 pounds in the fall of 2018), constant sweating, difficulty concentrating or sleeping, and which forced Mr. Cerce to commence prescription medications and mental health treatment.

56. To Mr. Cerce's horror, the retaliation continued upon his return to the office.

57. Whereas almost the entire office had been sent to Seattle for the company's annual "ZG week" – ZG18 - Mr. Cerce was informed by Mr. Horner that he was among a handful of employees who were being required by the Company to stay behind and work.

58. Mr. Cerce asked why he was being punished in this fashion, to which Mr. Horner replied that he did not think that it would be good for Mr. Cerce to attend ZG week "and be talking to everyone about everything that had happened."

59. Whereas Zillow falsely maintains that it did not deny Mr. Cerce the opportunity to attend ZG18, and that it was Mr. Cerce himself who requested that he be allowed not to attend the conference, it indeed was Zillow – at Ms. Sobil's direction – that prevented Mr. Cerce from attending ZG18, in retaliation for his protected activity participation and for speaking out against Zillow's security shortcomings and its mishandling of the stalking situation.

60. The conversation between Mr. Horner and Mr. Cerce was witnessed by coworker Lindsay Caldwell - who remarked to Mr. Cerce that it was "so f'ed up" that Zillow was not allowing Mr. Cerce to attend ZG18 – as well as by two other employees.

61. Mr. Cerce found that his PTSD and anxiety was interfering with his ability to reliably or consistently perform his job, and he requested numerous reasonable accommodations from Zillow, almost all of which were denied.

62. Zillow denied Mr. Cerce's request to be relocated to a desk where his back was not facing the room - a situation that aggravated his anxiety in the wake of the stalking situation - declaring that the company needed Mr. Cerce to help train new employees who sat near him.

63. Along with his first-line supervisor, Mr. Horner, several other Zillow employees witnessed Mr. Cerce throwing up at his desk on multiple occasions due to the anxiety of being put at a desk around people that he did not know in the wake of everything that had happened.

64. Nick Mietaune, who sat directly next to Mr. Cerce, was aware of this virtually "normal" routine, watching Mr. Cerce run from his desk to grab the trash can, or run to the bathroom to throw up.

65. Other Zillow employees crassly remarked Mr. Cerce that he was the "not the real victim" of the stalking situation, and they made assumptions about his personal difficulties because of his gender and based on information that had been disseminated by the Company.

66. Mr. Cerce made requests for time off to attend medical appointments, which requests were denied.

67. Whereas Zillow falsely claims that at no time following his return to work did Mr. Cerce disclose a disability or specific mental condition to Zillow, the Company in fact was fully aware of the mental health and medical complications that Mr. Cerce was experiencing in the wake of the cell phone thief/stalker situation.

68. In addition to the disclosures contained in his November 20, 2018 communications to Zillow (see *infra*), Mr. Cerce disclosed to Mr. Horner that some of his medical appointments were to see a psychiatrist and that he had been diagnosed with a psychiatric condition, and that his condition was affecting him at work.

69. Mr. Horner had multiple additional conversations with Mr. Cerce regarding his disability and the resulting problems at work that Mr. Cerce was experiencing.

70. Mr. Cerce also submitted to Zillow a letter from his psychologist on or about February 17, 2019 which not indicated that Mr. Cerce was being treated for PTSD, the psychologist requested that Mr. Cerce be granted a 60-day leave of absence in order to improve his symptoms.

71. Adding insult to injury, Zillow refused to afford Mr. Cerce any sales quota relief for the slow month of December 2018, despite providing such relief to all employees who attended ZG18 and despite initially promising to Mr. Cerce that he would be granted such relief.

72. This was a transparent attempt by Zillow to set up Mr. Cerce for failure, whereby he would miss his quota so that the Company could put him on a final and then terminate him for alleged performance reasons.

73. Mr. Horner offered a dubious and false explanation to Mr. Cerce: that if Zillow had provided the December quota relief, Mr. Cerce would have lost money.

74. Zillow also retaliated against Mr. Cerce in the context of his 2018-2019 raise.

75. Mr. Horner, who had recently been promoted to GM, handled Mr. Cerce's evaluation; the review was full of superlatives: "You are a rock star! You were at 220% to goal for the year. All your peers have nothing but great things to say about you and how you help everyone and have a great attitude. I wish I had an entire sales floor of you! Zero negative remarks."

76. Notwithstanding the sparkling review, Mr. Horner went on to explain that Mr. Cerce was only receiving half of his raise and a fraction of his shares.

77. After Mr. Cerce questioned Mr. Horner about this, Mr. Horner revealed that Mr. Cerce was not receiving his full raise because of a "technicality" – that Mr. Cerce had fallen just short of his October 2018 goal (91%), while the alleged theft/stalking situation was playing out.

78. Zillow thus punished Mr. Cerce for failing to achieve a goal during a month when he was on administrative leave – a month when he was not allowed to come to work or to even work from home.

79. The Company also gave away Mr. Cerce's book of business to other representatives, who then closed Mr. Cerce's deals.

80. Zillow thus assigned Mr. Cerce a quota for October 2018 - while he was participating in the investigation and on leave, and then simultaneously prevented him from achieving that quota.

81. Mr. Horner admitted to Mr. Cerce that Ms. Sobil was the one who had denied Mr. Cerce his full raise; Mr. Horner stated: "I know this is super f**ked up! I went to bat for you and was yelling, Greg Davis had to calm me down because I knew it wasn't right how you were being treated."

82. When Mr. Cerce did not immediately express outrage over this latest incident of retaliation, Mr. Horner appeared to become confused and asked, "wait, so you're not going to quit?"

83. Several days later, Mr. Horner admitted to Mr. Cerce in a meeting at his house that that Ms. Sobil would never allow Mr. Cerce to get promoted after what had happened.

84. Realizing that he had become a target of Zillow and Ms. Sobil, having been wrongfully vilified by the company in connection with the stalking incidents and Ms. Doe's departure, and up against the immense stress and enormity of the entire situation - having lost over 30 pounds, constantly sweating, being forced to commence prescription medications and mental health treatment, Mr. Cerce had no choice but to resign his employment.

85. Mr. Cerce notified Zillow of his resignation on March 13, 2019.

86. As a direct and proximate result of Zillow's illegal acts, Mr. Cerce has suffered severe financial and emotional distress.

## CLAIMS FOR RELIEF

### First Claim For Relief
### Gender Discrimination in Violation of Title VII

87. Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

88. Zillow, either directly or through its agents, discriminated against Mr. Cerce during his employment on the basis of his male gender, as described herein.

89. During his employment, as well as in constructively terminating his employment, Zillow treated Mr. Cerce in a disparate fashion than one or more similarly-situated female colleagues.

90. Such discrimination includes, without limitation, Zillow's more favorable treatment of Ms. Doe as a similarly situated employee in connection with the cell phone theft/stalking matter.

91. Zillow's unlawful employment practices complained of in the foregoing paragraphs were undertaken intentionally, maliciously, and/or with reckless indifference to Mr. Cerce's federally protected rights.

92. As a consequence of Zillow's illegal conduct, Mr. Cerce suffered, and continues to suffer, irreparable injury and damages.

### Second Claim For Relief
### Discrimination in Violation of the ADA

93. Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

94. Plaintiff is a qualified individual within the meaning of 42 U.S.C. § 12111(8) in that he suffered from a severe and debilitating illness, Defendant perceived him to have a disability, he had the requisite qualifications to perform and could perform the essential functions of the job

for which he was hired through reasonable accommodation, and he held and desired to continue to hold his job with the Defendant.

95. Defendant is an "employer" within the meaning of 42 U.S.C. §§ 12111(5) in that it is engaged in an industry affecting commerce and has had more than 15 employees for each working day in each of 20 or more calendar weeks in the current and preceding years. Thus, it is also a covered entity within the meaning of 42 U.S.C. § 12111(5).

96. Plaintiff was an employee of the Defendant within the meaning of 42 U.S.C. § 12111(4).

97. Defendant's unlawful employment practices complained of in the foregoing paragraphs were undertaken intentionally, maliciously, and/or with reckless indifference to Plaintiff's federally protected rights.

98. Defendant is liable for the acts and/or omissions of its agents and employees.

99. Defendant's discriminatory actions included, but were not limited to: (i) deliberately targeting Plaintiff for mistreatment and harassment as a result of his disability, (ii) limiting, segregating, or classifying Plaintiff in a way that adversely affected his opportunities or status because of his disability within the meaning of § 12112(b)(1); (iii) utilizing standards, criteria, or methods of administration that had the effect of discrimination on the basis of disability within the meaning of § 12112(b)(3)(A); (iv) failing to make reasonable accommodations for the known physical limitations of Plaintiff, an otherwise qualified individual employee with a disability, despite the fact that doing so would not have imposed an undue hardship on the operation of the Defendant's business within the meaning of § 12112(b)(5)(A); and/or (v) denying employment opportunities to Plaintiff based on Defendant's need to make reasonable accommodations for his impairments within the meaning of § 12112(b)(5)(A).

100. As a consequence of Defendant's illegal conduct, Plaintiff suffered, and continues to suffer, irreparable injury and damages.

101. Plaintiff has been damaged by Defendant's violation of the ADA inasmuch as he has suffered loss of past and future wages and benefits, loss of professional opportunities, emotional distress, and mental pain and anguish.

102. Plaintiff is entitled to his attorneys' fees and costs incurred in this matter pursuant to 42 U.S.C. § 12205.

103. Plaintiff is further entitled to any and all relief permitted under the ADA, 42 U.S.C. § 12117(a), including equitable relief.

**Third Claim For Relief**
**Retaliation in Violation of Title VII and the ADA**

104. Plaintiff incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

105. Mr. Cerce engaged in protected activities (i) by participating in the investigation of Ms. Doe's complaints, (ii) by complaining to Zillow of gender discrimination and retaliation, and (iii) by seeking reasonable accommodation for his disability.

106. As described, *infra,* Mr. Cerce was subjected to retaliation by Zillow in numerous ways as a result of engaging in the foregoing protected activities, including through being constructively terminated from his employment.

107. Zillow's unlawful employment practices complained of in the foregoing paragraphs were undertaken intentionally, maliciously, and/or with reckless indifference to Mr. Cerce's federally protected rights.

108. As a consequence of Zillow's illegal conduct, Mr. Cerce suffered, and continues to suffer, irreparable injury and damages.

**Additional Claims For Relief**

109. Plaintiff reserves the right to add additional claims after discovery.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against the Defendant, and award Plaintiff the following relief, to the fullest extent allowed by law:

i. Actual monetary damages for all injuries suffered by Plaintiff in an amount to be determined at trial, including but not limited to, damages for lost past and future wages and employment benefits;
ii. Punitive damages on all claims allowed by law and in an amount to be determined at trial;
iii. Attorneys' fees and costs, including expert witness fees, on all claims allowed by law;
iv. Pre- and post-judgment interest at the highest lawful rate; and
v. Any further relief that this court deems just and proper, and any other relief as allowed by law.

**JURY DEMAND**

The Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted this 29th day of June 2020.

MILLER & LAW, PC

**/s/ David J. Meretta**
David J. Meretta, No. 44409
1900 W. Littleton Blvd.
Littleton, CO 80120
(303) 722-6500
(303) 722-9270 fax
djm@millerandlaw.com

ATTORNEYS FOR PLAINTIFF